30173 Lexon Insurance Company, Inc v FDIC as receiver for First NBC Bank, New Orleans, et al. You may proceed. Your Honor, I'm sorry to interrupt, but Mr. Mansfield is not in the room yet. It takes two minutes. Yes, I'm sorry. Apparently the technology is slower getting him logged on, so we will wait. And you shouldn't be sorry because you did tell me there would be a delay. So we'll just sit tight. Thank you. Please join in. Okay, now we're all here. The court is now in session and the next case for today is 2020 30173 Lexon Insurance Company versus FDIC et al. Mr. Gooch, you may proceed. Thank you, Your Honor. May it please the court, my name is Kyle Gooch and I represent the appellant Lexon Insurance Company. In dismissing Lexon's claim against the FDIC receiver, the district court made three errors. First, it held that standby letters of credit are contracts under FERIA section 1821E when they are actually undertakings governed by statute. Second, the district court held that there were no triable issues of fact as to whether the FDIC's five-month delay in repudiating the letters of credit was reasonable, even though there were plainly disputes about what the FDIC decided, when they decided it, and whether the FDIC's conduct prejudiced Lexon, all of which bear on the question of reasonableness. And third, the district court held that Lexon had no actual direct compensatory damages, even though Lexon lost nearly $10 million in collateral and the right to hold that collateral until its liability on the bonds is fully resolved. Turning to the first issue, the question before the court turns on the meaning of the word contract in section 1821E, and that section allows the FDIC as receiver to repudiate any contract or lease that it deems to be burdensome to the receivership. And Congress did not define the word contract here, and so as both parties have acknowledged in their briefs, the court should look to the ordinary meaning of that term, and in particular because it's a legal term, the court should look to the generally accepted common law definition of a contract. Now, under the classic definition of a contract, it has certain features, a bargain for exchange of promises, a meeting of the minds, and consideration, but a letter of credit does not share any of these features. There's no bargain for exchange. In fact, it is rare that the issuer and the beneficiary actually negotiate the terms of the credit. Any bargaining would take place in the negotiations of the other two contracts that define the rest of what's called the triangle of a letter of credit. Nor is there any meeting of the minds. It's often the case that the issuer and the beneficiary are unknown to each other, and there's no consideration required for the letter of credit. Letters of credit have different history, have different purpose, and different theoretical framework compared to contracts. The history of letters of credit really goes back to antiquity, but they have developed over the years as mercantile instruments to facilitate transactions. They essentially allow a party to substitute its credit worth, credit worthiness for the credit worthiness of a bank, and they are not governed by the law of contracts, but by statute, and by specifically Article V of the UCC, the framers of which set up an independent theoretical framework for letters of credit. Has Article V held on two occasion or referred to on two occasions letters of credit as being a contract? It has referred in passing and has had some other courts, but this court has also held or referred to letters of credit in LaBarge as being an undertaking as opposed to a contract, and so, you know, in passing it's sort of referred to it in both ways. We've cited a number of cases where courts have really looked at this and have found that they are not contracts, that they're really different, and I've... Are any of those cases in the context of FIREAT, this particular section, that allows a repudiation of contract or lease? No, no, they have not been. They've been in other contexts, and I point the court in particular to the Tenth Circuit's decision in Arbest, which examined, you know, sort of the history a little bit more and talks about the different theoretical basis for a letter of credit. Why do you think the statute distinguishes between a contract and a lease, if it does? It mentions both a contract and a lease. What's the purpose? Is that just redundance, or what is it? So, I think it would be redundant if you took the broad definition of contract that the appellees have put forward. Well, they can be overlapping. I mean, leases are contracts, right? So, leases are contracts, but they're also historically recognized as being also something different. They're also recognized as being conveyances of land and sort of a bridge between contracts and property law. And so, if you think about it in that way, the classic definition makes sense, because if you're talking about contracts that are within the framework of contract law, and then you want to make sure that that also encompasses a lease, which is sort of stems or bridges between contract law and property law, then it makes sense to identify leases in particular as also being subject to repudiation. What's the purpose of the FIREA section we're talking about here that allows repudiation? And my point being, doesn't it make perfect sense to think of a letter of credit in terms of a contract, given the purposes of that section? Well, so the purpose is to allow banks to get out of burdensome contracts. But here, just as in pre-FIREA case law, the bank's obligation, the right to draw on the letter of credit, is already vetted before the receivership, before the insolvency, before the appointment of the receiver. And so, it should already be on the books of the bank as a loan that's already been made. And so, I don't think it furthers the purpose. And certainly, if we're looking at this from a textual point of view, the court should be guided by the ordinary understanding of what a contract means. And the cases are legion that a contract requires offer, acceptance, and consideration. And these things are absent here. Turning to damages, even if a letter of credit were considered a contract, even if it could be repudiated, and even if it were properly repudiated, that doesn't mean that the beneficiary is left without a remedy. In giving the FDIC receiver the power to repudiate these contracts, Congress also gave the injured party a claim for damages that flow from the repudiation. And under Section 1821E, the injured party may recover its actual direct compensatory damages determined at the time of the appointment of the receiver. As the Eighth Circuit... What judgment evidence supports your damages claim? What summary judgment evidence supports that you incurred, your client incurred, actual direct compensatory damages in amounts due and owing? So, we did not receive the $9.985 million that we should have been able to receive. So, that's... Compensatory damages as an amount due and owing, that's never been... The amount due on the... That you could have gotten the letter of credit is not actual direct compensatory damages. Well, I would argue that it is. And because you... What authority do you have? So, is that in the record, by the way? Do you have... Do you have an affidavit that you should have gotten on the amount that it was repudiated, that it was due and owing that amount, and that it's actual direct compensatory? Is that in the summary judgment record? Well, so there was no summary judgment record. This was briefed as a Rule 12 motion below. Right. And because you attached documents, the district court converted it to a summary judgment. Well, the documents were attached to the pleadings for the most part, with I think one exception. So, both parties argued below that those documents were properly before the court on a Rule 12 motion. And so, because of that procedure and because we didn't... We're not aware that the court would convert it to a Rule 56 motion, there were no affidavits. In terms of the damages... So, there is no specific evidence before the court in the summary judgment? In the record? So, there is evidence. So, I would argue two things as to the damages. First, under the substantive law here. So, I think what you... The first step is you look at what is the remedy under the substantive law. And the second step would be, does FERIA take any of that remedy away? Does it disallow any of that remedy? So, the remedy under the substantive law, under UCC Article 5, is the recovery of the amount of the letter of credit, the face amount. But that's not the same thing under the statute, which is only direct compensatory... Actual direct compensatory damages in an amount due and owing. That's different. Well, the amount was certainly due and owing. Lexxon could have drawn it at any time. Does that mean in order to make you whole? I interpret actual compensatory damages to be right? As opposed to consequential damages of loss of profits or something like that. Right. Okay. So, full amount of the letter of credit? $9.8 million? That's correct. We bargained for the right to have and to keep that $9.985 million as collateral until the obligation on the bond is determined. And so, that's what we will... Bargaining for expectancy damages is not compensatory damages. That's the expectancy of the contract being fulfilled, assuming argument it's a contract. And I know you spent some time on that. Those are expectancy damages, not compensatory losses that your clients suffer. Help us on that. Well, I think you've got to look for what would the loss have been if the contract was fulfilled versus not fulfilled. And you can also look at the ex ante position that we were in. Before the letter of credit was issued, we would not have taken on $11.1 million in risk on the bonding if we did not have collateral. And so, we've lost $9.985 million in collateral that would be in Lexxon's bank account, but for the repudiation. So, that's... Why didn't Lexxon, if they could draw it down at any time, why didn't they go ahead and do that? Well, I don't know the answer to that. It doesn't appear in the record. All I can say is that Lexxon has a lot of bonds and irons in the fire all over the place. Well, and again, if this letter of credit... Well, when the FDIC gave notice that it might repudiate these letters of credit, Lexxon never went and asked, I guess it's Lender Oil, to procure other letters of credit. In other words, it could have gotten collateral to replace these, correct? Well, certainly by the time the FDIC repudiated, it repudiated only two weeks before Lender declared bankruptcy. I'm talking about before they repudiated that. They gave notice that they might do so, correct? We received, I think, a month or two earlier, yes, we received a letter that said they might do that. I don't know whether Lender was in a position to provide such alternate collateral at that point. Certainly they were not by the time the FDIC repudiated it, which was less than two weeks before Lender filed a Chapter 7 bankruptcy petition. Right, but you haven't... There are no arguable loss, if there ever was a loss, until summer of 2020, when the payment for the bonds were called for. How was there an actual loss ever? There's a loss of $9.95 million in collateral, which should be in Lexxon's account right now. What authority says that's a compensatory direct due and owing damage, under any theory of damages? Well, that's how you would measure the damages under UCC Article 5. Expectancy damages, but we're talking about under the statute, which is narrowly... Because they want the FDIC... Congress has decided that FDIC should be able to come in and make these transactions. They've made them only liable for compensatory losses, not expectancy losses. Right, and what the cases say is that the right has to be vested at the time of the appointment of the receipt. Right to do what? The damage. Right to what? A right to what? Well, the contract right that's being repudiated. Yes, a right to what? In this particular case, is it a right to? It's a right to receive the collateral, the $9.95 million in collateral. Okay, does that mean as of the time when you have the letter of credit, did you get the money? Or is it an expectation that if the bonds are called in, it'll be covered to the extent of the letter of credit? So the arrangement was Lexxon, at any point it wanted to, could draw that $9.95 million and keep it until the bond was totally resolved to cover its losses on the bond and its expenses and its costs. And so Lexxon should have that... Losses on the bonds would be if the government, the BOEM decided to call in the bonds, right? Right, which of course... When that happened, I don't know how this works, when that happened in September, whenever that was, what... I mean, did the government just say, look, we're calling in the bonds, you owe us $11.5 million? Is that what happens? I think there's a little bit more to it than that. So tell me what happened. Well, there's going to be also some negotiations. There's others in the chain of title for these assets who might be contributing to that. We don't know what it's going to be. I suppose it only costs you $5 million instead of $9 million. Would that mean your actual loss is only $5 million? Well, our loss on the obligation that we're talking about here is the loss of the right to keep that $9.95 million collateral. Now, the future repayment obligation has not accrued yet. Yeah, I know. That's our point, that the other side's in. Mr. Brooks, it's your turn. Good afternoon, Your Honors, and may it please the court. I am Joseph Brooks on behalf of the FDIC as receiver. I will be addressing the claims under FIREA against the FDIC and its receivership capacity. The United States is separately represented by Mr. Mansfield, who will address the court with any questions you have the FDICA claim. With respect to the question of whether or not a letter of credit is a contract for purposes of FIREA, we, of course, rely on the Granite case primarily out of the Eighth Circuit, a published decision issued earlier this year that is directly on point. While it involves the National Credit Union Administration Board, FIREA, when it was passed, included materially identical provisions that apply both to the NCUAB and the FDIC. And the question of what the phrase any contract means in these FIREA provisions was squarely presented to the court. And the court held that because that is a question of federal statutory interpretation, the Supreme Court's general rule that when interpreting words in a federal statute that have an established common law meaning, you must use the established common law meaning applies here. And when the Supreme Court looks for the general common law meaning, it does not look to state law. Rather, it generally looks to sources such as most prominently the Restatement Second, and indeed did so in the Community for Creative Nonviolence case cited in our brief. So too did the Eighth Circuit. And it turned to the Restatement Second of contracts, which was in place at the relevant time, which was 1989 when the statute was adopted. The definition is very straightforward. Quote, a promise or a set of promises for the breach of which the law gives a remedy or the performance of which the law in some way recognizes as a duty. Unquote. Here, the bank promised to pay Lexon on receipt of a draft. And Lexon certainly maintains in this case that there is a legally enforceable duty for it to do so. Even if the court were to go beyond the case that's directly on point and look to other things that have been suggested might be relevant, this court in FDIC versus Plato plainly described a letter of credit as, quote, a contract between the bank and the beneficiary. Lexon counsel says, well, in Lafarge the court said otherwise. But keep in mind that Lafarge was a 2003 case and that Plato was a 1993 case. You need to have the understanding that Congress would have had based on the law as it was at the time the statute was adopted. Counsel also referenced UCC Article V. It's true that in 1995 the relevant portion of Article V was changed. But prior to 1995, including in 1989 when FIREE was adopted, the UCC Article V described a essentially a contract. And as we point out in our brief, no less of a respected secondary treatise than Williston on contracts states as follows. Letters of credit are another type of commercial specialty properly includable within the definition of a formal contract, unquote. I believe it was distinguished between contracts and leases. And the reason it does so, we believe, is if you look carefully at 1823E, the provision that's an issue here today, if you go down to Section 2, you'll see that, excuse me, if you go down to Section 4 and 5, you'll see that FIREE treats leases differently than contracts, even though, as you pointed out, Your Honor, a lease certainly within the classical definition of contract. But for damages purposes, FIREE treats leases differently. For example, rent is due to the lessor up until the date of impudiation, not the date of receivership. And a lessee under a bank's lease may elect to treat the lease as terminated or remaining in possession. And so we believe the reason why that distinction is made is for that purpose. And unless the Court has any questions on this issue, I can move on. Counsel, can you move on to explain why you took three years to repudiate? Not you personally, but... We didn't take three years, Your Honor. We took, I think it was five months. Oh, I thought it was a long period of time that y'all said y'all were going to do it, and it just sat around. No, Your Honor, not in this case. Am I wrong on that? You tell me I'm wrong, so... In this case, the receivership date was April 28th, 2017. And the repudiation date was September 28th, 2017. And what happened is within the first four days, a letter went out to Linder. That's the May 2nd, 2017 letter. The important thing about that letter is that while it indicated that the by the way, just for your reference, this is in the Record on Appeal 1073. It gave Linder 30 days to come back to the FDIC with information about whether or not there was a reason to keep these letters of credit in place. And indeed, that's precisely what happened. Linder did come back. The Record, undisputedly, no refuting evidence establishes that there were two-plus months of negotiations. And these negotiations weren't just about a $10 million letter of credit, because it's also undisputed that that $10 million letter of credit was part of a $109 million loan portfolio of outstanding loans Linder had to the bank. And what the FDIC typically does in these situations is it tries to move an entire bank, if it can, or whatever surviving assets there are, rather than break it up piecemeal. But certainly in an instance like this, a single portfolio of loans, they would try to move together. And the reason why is a lot of times there's interworking parts. They rely on each other. And in this instance, the FDIC's concern was they wanted to deal with Linder if they could, and deal with the entire $109 million loan portfolio, including the letter of credit, because that's what was at risk. And those negotiations went on. There were proposals that came back and forth. There were many meetings. It's detailed in our brief. And notwithstanding the fact that those negotiations were underway all the way through June and then through July, in mid-June, IC sent a letter to Lexon. And in that letter, which is in the record at the Record on Appeal 1075, excuse me, wait a minute, I got that wrong. It's in the record at 1097, written on Appeal 1097. The FDIC first says, we are reviewing everything that we have at the bank to consider whether we could repudiate it, including the letter of credit that you have. And it goes on to say the following. The receiver strongly suggests that you immediately take any action necessary to arrange for the issuance of any new standby letter of credit from another financial institution, unquote. Well, for reasons that I can't explain, and I know one of your colleagues on the bench asked Lexon counsel, he couldn't explain, but for reasons that are not explained anywhere in the record either, Lexon did nothing. They didn't go to Linder, which is what you would expect, and say, Linder, you know, we've got these bonds. You have an obligation to provide security. Go get an alternate letter of credit. And by the way, if they had done that, which is what you'd expect, their damages in this case would, of course, be zero, because any cost to get the new letters of credit obviously would have been borne by Linder. It kind of, going back to my original question, you're not just seeking to pounce, and so you don't just repudiate on the first day you take over, you do these things so that commercially reasonable arrangements can be made. I mean, it's, I mean, it'd be perfectly reasonable to pounce on the first day, but this, you're trying to keep these commercially reasonable things going. Well, Your Honor, the FDIC has a statutory obligation, the statute's referenced and cited in our brief, to maximize the return on the receivership. This is not, as counsel has suggested, a bank trying to get out from the letter of credit, and it's not the FDIC, a federal agency, trying to avoid a letter of credit. The FDIC, in its receivership capacity, marshals assets in order to distribute the maximum amount available to credit. And so we have an obligation to resolve this loan portfolio in the way that, in our discretion and our judgment, will generate the greatest return. And so these negotiations that I'm detailing, the reason why I believe they were relevant to your question is I'm trying to explain what you asked. Why did it go for five months? And the reason why is the FDIC was making the efforts that it would normally make, that any responsible person in this position would make, to try to get the most efficient, greatest return for the FDIC. Can you turn to damages now? You mentioned damages in answer to this question. Are the, is this nine million plus damages? No, Your Honor, it's not damages. And again, we rely primarily on the, um, Granite case, which dealt with precisely the same question, albeit in the context of a motion to dismiss. And what the court in Granite, uh, had before it was an insurance company that had, um, issued bonds to secure an active, um, construction contract. And the credit union failed. The and the party came forward and said, well, wait a minute. Um, you know, we have damages because in that case, the, um, bonds had been drawn on by the party secured by the bonds prior to the date of receivership. And Granite specifically referenced, uh, excuse me, the 8th Circuit specifically referenced that in its decision. So that was the loss. The loss was the amount that had been drawn on. Exactly. Exactly. In that case, $385,000, which was the full amount of the letter of credit had been, uh, claimed, uh, prior to the date of receivership. Whereas in this case, no claim was ever made during any relevant time period. Right. As of the time we filed our brief, Your Honor, more than three years had gone by since receivership. No claim had been made. I understand something I said, but I don't know the particulars of it. And another example is the credit life case out of the District of New Hampshire. Same thing. In that case, the parties gave a letter of credit one to the other to secure obligations to pay reinsurance. But they also had a requirement that one of the parties set up a trust account. And their agreement provided that the letter of credit could not be drawn on until the trust account was exhausted. And in that case, on the date of receivership, on the date of bank failure, the trust account still had money. And so, the District of New Hampshire held, consistent with Brandon, uh, consistent with the statutory language, that there were no losses incurred prior to the date of receivership. Same thing. Why don't we use the entire amount of the collateral? Why isn't that a viable damages theory? Well, there's two reasons, Your Honor. One is, as Judge Duncan suggested earlier, you don't know what's going to happen. But the second one is, is that this letter of credit expressly provided that in the event that the losses, uh, incurred, uh, after a draw had been made were less than the amount of the draw, that amount had to be repaid to the bank. Well, why does the FDIC statute set the date of receivership as the date when we're going to, you know, take a look at whether there's losses or not? Well, these receiverships don't stay open forever. But these letters of credit may. What would happen under, uh, Mr. Gooch's theory is that his client would be able to draw out $10 million. The receivership would be closed up. Turns out, well, lo and behold, there was either only $8 million or maybe no damages. He's holding eight, nine, $10 million. There's no receivership. The bank's former creditors didn't get the money. Where does the money go? The statute, uh, resolves this issue in the only sensible way that it can. It freezes the world on the date that the bank becomes insolvent. And, and so if the losses are not incurred then, you haven't suffered any, uh, damages, determinable due and owing as of the date of receivership. Do you have anything else, counsel? Unless the court has further questions, Your Honor, no, I, I don't believe so. Judge Duncan, Judge Wilson, any further questions? No. Thank you. Thank you, Mr. Brooks. We'll proceed. Mr. Mansfield. Good afternoon, Your Honor. Excuse me. May it please the court. Peter Mansfield with the U.S. Attorney's Office in New Orleans here on behalf of Defendant Apelli, the United States of America. The District Court correctly dismissed Lexon's cause of action under the Federal Tort Claims Act for lack of subject matter jurisdiction because Louisiana law does not impose a tort duty on an analogous private person acting in light circumstances to the FDIC in its pre-receivership corporate regulatory capacity. Even if this court disagrees with the District Court's tort duty analysis under Louisiana law, the discretionary function exception of the FTCA applies, which immunizes the FTC, FDIC's tort. As I mentioned, the District Court resolved the United States jurisdictional motion exclusively on the basis of an absence of a tort duty that would apply to an individual in the private sector acting under state law. And this private person analogy is really, it lies at the core, at the center of Congress's waiver of sovereign immunity in the Federal Tort Claims Act. It's so essential and indispensable to that waiver that it's stated twice in the plain statutory language itself. The first time it's section 1346b1, and the private person analogy is reiterated in slightly different language in 2674 as well, both of which are quoted in our brief. Counsel, does the FDIC corporate have a preference in the way that the court approaches it? No, they're both jurisdictional. They could have been reordered, placing the discretionary function exception first. We happen to lead with the absence of tort duty. The District Court could have elected to address discretionary function exception first and leave the private person analogy tort duty alone, but it just elected to address them in the order of our brief. But there wasn't any particular rhyme or reason to that. We think they're both equally as strong, quite frankly. And it just seemed to make more sense to address the tort duty issue first, because again, it really lies at the center of Congress's waiver of sovereign immunity. The discretionary function exception is a carve-out from the general waiver, but in this case, if you look at 1346b1 and 2674, we say Lexon can't even get off the starting line because they can't identify a tort duty that would apply to a private person acting under state law. And that is part of the court's inquiry into its own subject matter jurisdiction under the FTCA, the absence of a state law tort duty. This court and numerous other federal courts across the world have held that. And we've cited the FEMA formaldehyde trailer case from 2012, which includes some helpful discussion on the relationship between the private person analogy and the presence or absence of subject matter jurisdiction. Now, the District Court correctly observed, and this is just a matter of common sense, that no private person acting under state law does exactly the same sort of functions that the FDIC does under federal law in terms of regulating and perfect apples-to-apples comparison between the federal governmental action and what might occur in the private sector under state law. The early case law under the FTCA would refer to federal banking regulation, operation of a lighthouse, inspection of mines as what they would call uniquely governmental function. So in 2005, in a unanimous Supreme Court decision, the Supreme Court said that when faced with those quote-unquote unique governmental functions, the court needs to stretch and look a little farther afield to find that private sector analog utilizing good Samaritan principles of tort liability. The Louisiana Supreme Court has adopted the good Samaritan standard found in Restatement Second of Tort, Section 324a. And if you apply that standard to Lexon's allegations, it becomes quite clear and evident that Lexon's allegations fail on every single element. They're not alleging physical harm. They don't allege that the FDIC corporate undertook any special duties owed to Lexon. They don't allege that the FDIC made FirstNBC's situation worse or exacerbated their already tenuous financial situation. Nor do they allege that they specially relied on what the FDIC was doing in its execution of the consent order. They don't even allege that they were aware of it before the receivership was put into place. So to be clear here, if the court were to reverse the district court on the tort duty issue, it would be an unprecedented extension of tort law duties under Louisiana law. It would be a deviation from the plain language of Restatement Section 324a that Louisiana Supreme Court has adopted. And perhaps most importantly, it would be a break in a 40-year body of case law that says that the FDIC corporate owes no duties to the banks they supervise and regulate, much less to the bank's customers, borrowers, officers, directors, or those that do business with the bank borrower, like Lexon in this case. If there are no further questions from the court, we would just urge the court to affirm the dismissal for lack of jurisdiction on either basis, the absence of a state law tort duty, or the discretionary function exception. Thank you, Mr. Mansfield. I'm sorry, Judge Duncan, did you have a question? Okay, thank you, Mr. Mansfield. Mr. Gooch, you said time for rebuttal. I don't know if you want to address the corporate arguments or not. We didn't talk about those. You're on mute. I apologize about that. I'd like to start, if I could, with the receivership because I think that's there's some important issues that got raised on this issue about whether Lexon has any damages. First of all, I disagree with counsel's reading of the Granite Ray case about what it held as damages. I don't think that issue really got squarely presented there in part because of the way in which that case came up. It was a 12B6, and so that issue just was not decided. But in terms of whether you look to the underlying bond for the loss here, I think that would violate the independence principle, which really characterizes letters of credit. I mean, the independence principle is what gives letters of credit their commercial vitality, as the Tenth Circuit noted. And so you really have to look at the letter of credit obligations separately from the underlying transaction. And really here, the underlying transaction is not even the bonds. The underlying transaction is the surety obligation between lender and Lexon. But another point that I want to make is counsel mentioned the repayment obligation. There's nothing in the statute that allows the FDIC to accelerate that payment obligation. All right. So what is determined as of the date of the receivership are Lexon's damages, not any kind of acceleration of any other contractual rights or remedies that the receiver or the bank would have had. Counsel, I'm very perplexed by your argument that Granite didn't address the losses incurred on the repudiation in any kind of tangible way. Yes, it's a 12B case, but it says it alleged that Granite incurred substantial losses on the bonds, and it would have used the letter of credit to cover up to 385,000 of those losses, but now must cover them themselves. So it's specifically pled that it had already incurred substantial losses at the time. And then it says, although it realized these damages on or before June 23, and so it talks about them incurring the damages already, and that they're pled. Can you help us with that? Why that's not the holding of the case? Well, there has to be an issue for it to be the holding. And so the issue about whether if that had not been the case, the claim would have been viable was therefore not presented in Granite. The court just, it says that it assumes that their losses did exist, and so therefore it's not presented with this issue. And why did the New Hampshire case, which also goes against you on this point, do you have any authority that goes your way on this point? This is a very important point. It is a very important point. That's why I'm spending a lot of time on it. I would, just to the idea that even if you don't, even if you don't measure this by the full value of the collateral, there was at least some value. There was at least some present value to losing the collateral at that point. And at that point, I'd actually like to direct the court to the City Bank South Dakota case, which is a case that the Apple East site in their brief. And the case involved the loss of an intangible right not to compete. And the court held that the present value of that intangible right could be determined, and that that was an issue of fact. And I think that the same really holds true here. Even if you determine that the right to hold the collateral isn't going to be measured by the amount of the collateral, the right to hold that $10 million in collateral at least had some present value. And the loss of it had some existing loss at the time of the repudiation or the time where the repudiation relates back to. So, if this case had been presented in a different procedural context, if we had had the opportunity to put together affidavits and present them to the court on a Rule 56 motion, we would have certainly been able to present evidence as to exactly what that loss was. It might be, for example, the cost to re-insure that risk, or there might be other ways to value it. The problem here was that we didn't even get a chance to make those arguments because of the way this was decided. Well, I do have a question about that because the court dismissed the initial complaint and then granted time for discovery and re-pleading. Did that include just general discovery or was only limited discovery about the proper parties and that sort of thing? It was very targeted discovery and the main issue at the time was in the initial complaint, we hadn't named the FDIC in its corporate capacity and we were trying to figure out what claims, if any, were to be targeted towards. It was not plenary discovery. Okay, did you complain in the district because the case stayed in the district court for some months while the court adjudicated the corporate claims before there was a final judgment. Did you complain between September and February while the court could fix that error if there were an error there? We did not move for reconsideration or anything like that, but this court's precedents, as noted in our 28-J letter response, allow a direct appeal and they don't require such a motion. But the case is just sitting there in the district court and you think the court's made an error at that time. I think we have your argument, counsel. We appreciate the arguments of all counsel. This court will stand in recess until tomorrow afternoon at noon. Thank you very much.